# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL ACTION NO.** <br> **1:23-CR-66-MHC-CCB** |
| **HORACE DULANEY, et al.,** | |
| **Defendants.** | |

## FINAL REPORT AND RECOMMENDATION

Defendant Horace Dulaney is charged with conspiring to make false statements to a firearms dealer in violation of 18 U.S.C. § 371 (Count 1); making false statements to a firearms dealer in violation of 18 U.S.C. § 924(a)(1)(A) (Counts 2–14); and possessing firearms after having been convicted of a felony in violation of 18 U.S.C. § 922(g)(1) (Count 15). (Doc. 1). He has filed a motion to suppress evidence seized as a result of a traffic stop, (Doc. 35),[1] a motion to suppress three cell phones seized without a warrant, (Doc. 36), and a motion to suppress statements that he made to law enforcement, (Doc. 34). The Court held an evidentiary hearing on January 8, 2024. (Doc. 45). Defendant filed post-hearing

---

[1] Defendant Kiara Patrice Moore adopts the motion to suppress evidence seized as a result of the traffic stop. (Doc. 40).

briefs as to each motion, (Docs. 48, 49, 51), the Government filed an omnibus response, (Doc. 55),[2] and Defendant filed a reply, (Doc. 57). For the reasons explained below, I **RECOMMEND** that the motions to suppress evidence seized as a result of the traffic stop, (Docs. 35, 40), be **DENIED**; that the motion to suppress evidence seized from the three phones, (Doc. 36), be **DENIED**; and that the motion to suppress statements, (Doc. 34), be **DENIED in part** and **DENIED AS MOOT in part**.

## I.    FACTS

### A.    Events Leading up to the Day of the Traffic Stop and Arrest

The indictment in this case reveals an investigation that unfolded between March 8, 2020, and August 20, 2020. (Doc. 1 at 3–8; Doc. 45 at 16). Over that time period, Defendants Dulaney and Moore purchased 49 firearms and are alleged to have attempted to purchase three others. (Doc. 45 at 25; Doc. 1 at 3–8). The first alleged transaction occurred on March 8, 2020, when Dulaney attempted to purchase a pistol at a gun show in Marietta, Georgia. (Doc. 45 at 18–19; Gov't Ex.

---

[2] The Government filed a motion for leave to file a brief in excess of 25 pages. (Doc. 54). Neither Defendant filed any opposition to the motion, which the Court now **GRANTS**.

8).[3] That attempted purchase was denied after the firearms dealer completed the required background check. (Doc. 45 at 18–19; Gov't Ex. 8). At the time, Dulaney was a convicted felon. (Doc. 45 at 25–26, 115). However, on the ATF Form 4473 that Dulaney filled out in support of the attempted purchase on March 8, he checked a box stating that he had *not* been convicted of a felony. (Gov't Ex. 8).

Agents subsequently identified transactions in which Defendant Moore purchased firearms at stores in the Northern District of Georgia. (Doc. 45 at 24–25; Doc. 1 at 3–8). Specifically, agents identified transactions in which Moore purchased 40 firearms at various stores between March 21, 2020, and August 15, 2020. (Doc. 45 at 24–25; Doc. 1 at 3–8). Agents went to the stores where Moore purchased the firearms and obtained the ATF Forms 4473 that she completed at the time of the sales. (Doc. 45 at 112–13). At one of the stores, Grove Pawn, the clerk told agents that during purchases of firearms on August 14 and 15, 2020, Moore was accompanied by a black male and that his debit card was used to fund part of the purchase, along with Moore's debit card. *Id.*

Agents obtained records showing that Moore purchased six firearms at Grove Pawn on August 14, 2020. (Doc. 45 at 23; Gov't Ex. 9). Video surveillance

---

[3] The Court cites exhibits that were introduced by the Government at the evidentiary hearing held on January 8, 2024.

from Grove Pawn shows Moore and Dulaney together inside the store on August 14, (Doc. 45 at 21–22), and the purchase on that date was paid for in part using a debit card in the name of Kiara Moore and in part using a debit card in the name of Horace Dulaney, (Gov't Ex. 9). In fact, although Moore is identified as the purchaser on the Form 4473, surveillance photos from the store shows Dulaney carrying out the boxes of firearms. (Doc. 45 at 22; Gov't Ex. 6).

Moore purchased two more firearms from Grove Pawn the next day, on August 15, 2020. (Doc. 45 at 19–20; Gov't Ex. 5). Surveillance photos from Grove Pawn show that Moore and Dulaney were in the store together during the purchase on August 15. (Doc. 45 at 20; Gov't Exs. 5, 6).

B.      **The Day of the Traffic Stop and Arrest**

On August 20, 2020, the owner of Grove Pawn called now-former ATF Special Agent Jonathan Gray and advised him that Moore was back in the store attempting to purchase more firearms and that the Black male gentleman that was with her previously was there as well. (Doc. 45 at 129–30). Agent Gray and Special Agent David Diaz drove to the store, in separate cars, to conduct surveillance. *Id.* at 130–31. The clerk of the store told Agent Gray when the purchase was being completed, and Gray saw Moore and Dulaney exit the store. *Id.* at 131–32. Dulaney was carrying five boxes of firearms. *Id.* at 115–116. Dulaney put the firearms in the

4

back driver's-side seat of a white Nissan Pathfinder, he and Moore got into the vehicle (with Dulaney driving), and they left Grove Pawn. *Id.* at 115–16, 132; Gov't Ex. 7 (photographs).

Agent Gray followed Dulaney and Moore up Interstate 85 and contacted the Georgia State Patrol (GSP) for assistance. *Id.* at 114–15. Gray told the trooper that Moore and Dulaney were headed north on I-85 in a white Nissan Pathfinder with North Carolina plates, that Dulaney had an active arrest warrant, that Dulaney was a felon, that Dulaney was driving the vehicle, that agents suspected Moore and Dulaney were involved in trafficking firearms, and that Moore had just purchased five guns. *Id.* at 77–78, 85, 95, 115. GSP Lieutenant Charles Chapeau ran Dulaney's name through the NCIC, which confirmed the arrest warrant and advised that Dulaney was a flight risk. *Id.* at 77–78.

A GSP trooper stopped Dulaney's vehicle for failing to maintain its lane. *Id.* at 76. The stop occurred near Commerce, Georgia, which is about 30 miles south of the South Carolina state line. *Id.* at 78. Troopers approached the car and immediately smelled a very pungent odor of marijuana. *Id.* at 104. The troopers put Dulaney in handcuffs and searched the vehicle. *Id.* at 101, 104; Gov't Ex. 1 at

21:05:44–21:06:10.[4]  Inside they located nine firearms, three cell phones, marijuana, a grinder, and a scale. (Doc. 45 at 32). While searching the vehicle, one of the troopers plainly observed a cell phone that was in navigation mode. *Id.* at 84. The phone showed that the vehicle was traveling north on I-85 and had three or four more hours until arriving at the programed destination, which suggested to the trooper that Moore and Dulaney were headed out of state. *Id.* at 84–85.

ATF agents took possession of the marijuana, firearms, and cell phones. *Id.* at 128. Agent Gray testified that Moore had listed a cell phone number on the ATF 4473 forms that she completed when purchasing firearms. *Id.* at 125–26. The form requires a phone number so that the firearms dealer can call the applicant after completing the background check. *Id.* at 126. Agent Gray further testified that in the course of conducting surveillance and reviewing the gun-store videos, Moore and Dulaney were observed using cell phones at Grove Pawn during the firearms transactions. *Id.* at 46–47, 126. Eight days later, on August 28, 2020, ATF Special Agent Emily Norris applied for and received a federal warrant to search the phones. *Id.* at 39; Gov't Ex. 16. Agents did not search the phones prior to receiving the warrant. (Doc. 45 at 128–29).

---

[4] The time reference from the dash-cam video refers to the time that appears at the top of the screen next to the notation "eventDate."

## II.   ANALYSIS

### A.   Motion to Suppress Items Seized as a Result of the Traffic Stop

Dulaney filed a motion to suppress items seized as a result of the traffic stop, arguing that there was no reasonable suspicion to suspect that he had committed the violation of failing to maintain his lane. (Doc. 35). Moore adopts the motion as well. (Docs. 37, 40).

Dulaney filed a post-hearing brief in which he argues that he did not violate the Georgia statute applicable to lane changes, O.C.G.A. § 40-6-48. (Doc. 51). As such, he maintains, there was no valid basis for the traffic stop, and the evidence seized from that encounter must be suppressed. *Id.* In response, the Government argues that: (1) the trooper had probable cause, or at least reasonable suspicion, to stop the vehicle based on an improper lane change; and (2) the troopers had probable cause (based on the collective knowledge doctrine) to believe the vehicle would contain evidence of Dulaney possessing a firearm and aiding and abetting the making of a false statement to a firearms dealer, as well as because Dulaney had an active arrest warrant. (Doc. 55 at 15–19). The Government also argues that the troopers had probable cause to search the vehicle after they smelled marijuana. *Id.* at 19–21. Dulaney filed a reply brief, but he does not address this particular

motion in that brief. (Doc. 57).[5]

Under the collective-knowledge doctrine, the troopers had ample probable cause to believe that the Nissan Pathfinder would contain evidence of Dulaney (a convicted felon) possessing the numerous firearms agents saw him place in the vehicle. Moreover, they had probable cause to believe that the vehicle would contain Dulaney—who they knew was subject to an active arrest warrant. Because of the abundant probable cause to believe that the vehicle would contain evidence of the firearms crime and Dulaney himself, I decline to address whether there was also a valid basis to stop the car based on the alleged lane-change violation.

 "[T]he Fourth Amendment generally requires law enforcement officials to obtain a warrant before conducting a search." *United States v. Delva*, 922 F.3d 1228, 1243 (11th Cir. 2019). There are exceptions to the warrant requirement, however, including one for automobiles. "Under the automobile exception to the warrant requirement, the police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *Id.* (alteration adopted and internal quotation marks omitted). "For a warrantless search of an automobile to be constitutional, (1) the automobile must be readily

---

[5] Moore adopted this motion, and she filed a post-hearing brief. (Doc. 50). But she does not address this motion in her brief. *Id.*

mobile, and (2) there must be probable cause to believe that it contains contraband or evidence of a crime." *United States v. Lanzon*, 639 F.3d 1293, 1299–1300 (11th Cir. 2011). "Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in the vehicle under the totality of the circumstances." *Id.* at 1300. "Probable cause deals with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 241 (1983) (internal quotation marks omitted).

Here, there can be no doubt that the Nissan Pathfinder was readily mobile — the troopers stopped it as it was traveling on the highway. *See, e.g., United States v. Santana*, No. 1:17-CR-408-AT-RGV, 2018 WL 7283633, at *10 (N.D. Ga. Sept. 19, 2018) (finding that a car was readily mobile where the trooper followed the vehicle, pulled it over, and it stopped with no indication that it had ceased to be operational), *adopted by* 2019 WL 365743 (N.D. Ga. Jan. 30, 2019).

The second requirement for the automobile exception is that there had to be probable cause to believe that the vehicle contained contraband or evidence of a crime. The Government argues that there was probable cause based on the collective knowledge of the ATF agents. (Doc. 55 at 17–19). As the Eleventh Circuit has held, probable cause "exists where the facts and circumstances *within the*

9

*collective knowledge of law enforcement officials*, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) (emphasis added). The collective-knowledge doctrine applies, however, only if the law enforcement officers "maintained at least a minimal level of communication during their investigation." *Id.* "Thus, where, like here, the Government proceeds on a 'collective knowledge' theory, the validity of the stop and subsequent search rises and falls on the level of communication between the officer who conducted the stop and the other law enforcement officers who were aware of the facts establishing probable cause." *United States v. Khan*, No. 1:17-CR-40-SCJ, 2018 WL 2214813, at *6 (N.D. Ga. May 15, 2018).

Here, the level of communication between the agents and the GSP troopers was sufficient for the doctrine to apply. On August 20, 2020, Agent Gray called GSP Lieutenant Chapeau via cellphone to ask for assistance. (Doc. 45 at 95–96). Gray told the trooper that Moore and Dulaney were headed north on I-85 in a white Nissan Pathfinder with North Carolina plates, that Dulaney had an active arrest warrant, that Dulaney was a felon, that Dulaney was driving the vehicle, that agents suspected Moore and Dulaney were involved in trafficking firearms,

10

and that Moore had just purchased five guns. *Id.* at 77–78, 85, 95, 115. Lieutenant Chapeau ran Dulaney's name through the NCIC, which confirmed the arrest warrant and advised that Dulaney was a flight risk. *Id.* at 77–78. As such, prior to the stop, the troopers knew that Dulaney was driving, that he had an arrest warrant, that he was a felon, and that the Moore had just purchased five firearms. Indeed, Agent Gray saw Dulaney walk out of the store with the firearms and place them in the Pathfinder that the troopers stopped. *Id.* at 115–16, 132; Gov't Ex. 7 (photographs).

This level of communication and quantum of evidence is consistent with that of cases where judges on this court have permitted the Government to rely on the collective-knowledge doctrine. *See, e.g., United States v. Edwards*, No. 1:19-CR-76-LMM-CCB-13, 2021 WL 2947865, at *4 (N.D. Ga. July 14, 2021) (finding sufficient communication where agents informed the state officer of a suspected transaction, maintained uninterrupted surveillance on the vehicle, gave vehicle identifying information to the state officer, and maintained fairly constant contact with the state officer throughout the stop); *United States v. Guzman*, No. 1:17-CR-405-TWT-LTW-2, 2018 WL 7361073, at *5 (N.D. Ga. Dec. 13, 2018) (finding sufficient communication where the DEA coordinated with Georgia State Patrol prior to the operation, communicated with the GSP during the operation, and

directed the GSP to stop the vehicle), *adopted by* 2019 WL 718371 (N.D. Ga. Feb. 20, 2019); *Khan*, 2018 WL 2214813, at *7 (finding sufficient minimal communications where the DEA contacted the trooper prior to the stop, the trooper was on stand-by on the date in question, the trooper had a DEA radio in his car, the DEA was communicating with the trooper by radio on the day of the stop, and the trooper knew what was happening via updates over the DEA radio); *United States v. Agarwal*, No. 1:17-CR-43-TCB-RGV, 2018 WL 3061923, at *10 (N.D. Ga. Apr. 6, 2018) (finding sufficient communications where the DEA contacted Georgia State Patrol for assistance, the trooper attended the DEA briefing on the morning of the scheduled buy, and the trooper was in communication with the DEA by phone or radio throughout the day to learn the description and movement of the vehicle as well as the timing and location of the transaction), *adopted by* 2018 WL 2181620 (N.D. Ga. May 11, 2018); *see also United States v. Cotton*, 721 F.2d 350, 351–52 (11th Cir. 1983) (finding collective-knowledge doctrine satisfied where the officer with reasonable suspicion radioed another officer to stop the vehicle). Indeed, Defendant makes no argument in opposition to the Government's reliance on the collective-knowledge doctrine. (Doc. 57).

In sum, the collective knowledge of law enforcement established probable cause to believe that Dulaney would be driving the car and that he was subject to

an arrest warrant. Additionally, there was probable cause to believe that Dulaney, a felon, would be in possession of the firearms that agents observed him carry out of the pawn shop and place into the back seat of the vehicle. The troopers had ample probable cause to stop the car, and Defendants' motions to suppress evidence seized as a result of the traffic stop, (Docs. 35, 40), should be **DENIED**.

 **B.** **Motion to Suppress Evidence Seized from the Three Cellphones**

 As noted above, the troopers (and ultimately ATF) seized a number of items from the vehicle that Dulaney was driving, including three cell phones. The Government eventually obtained a warrant to search those phones, eight days after they were seized, and Dulaney argues the initial warrantless seizure violated the Fourth Amendment. (Doc. 48). He does not challenge the subsequent search or the validity of the warrant. The Government relies on the plain view doctrine, arguing that there was probable cause to believe that the phones would contain evidence of both drug and firearms trafficking. (Doc. 55 at 28–30).

 The Fourth Amendment protects the right of persons to be free from unreasonable searches and seizures. U.S. Const. amend. IV. A "seizure" of personal property occurs for purposes of the Fourth Amendment if the police meaningfully interfere with an individual's possessory interests in that property. See *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). "The 'plain view' doctrine

permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent." *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006). For the incriminating character of the item to be readily apparent, the officer "must have probable cause to believe that the object in plain view is contraband." *Id.*

Defendant focuses his argument on whether the incriminating nature of the phones was "immediately apparent." (Doc. 57 at 3–4). [6] I agree with the Government that the agents had probable cause to believe that the phones would contain evidence of firearms trafficking and, as such, they were lawfully permitted to seize them pursuant to the plain view doctrine.

There was probable cause to believe the phones would contain evidence of firearms trafficking. Again, at the time of the traffic stop, the agents were aware that Moore had spent more than $20,000 to purchase over 40 firearms between

---

[6] Although Defendant does not directly raise the issue, I readily conclude that the troopers were lawfully permitted to search the car. They had probable cause to believe they would find evidence of illegal drugs based on the pungent odor of marijuana they smelled when they approached the vehicle, (Doc. 45 at 104), as well as probable cause to believe that they would find evidence of Dulaney being a felon in possession of a firearm (recall that agents observed him place the firearms in the vehicle after he left the pawn shop) and firearms trafficking.

March and August of 2020. (Doc. 1 at 3–8; Doc. 45 at 16, 25, 69–70). The firearms were predominantly 9 millimeter and 40 millimeter handguns. (Doc. 45 at 25). And Agent Norris testified that, based on her training and experience, it can be an indicator of firearms trafficking when one person travels to multiple gun stores in a short period of time and purchases similar models and calibers of the same type of weapon. (Doc. 45 at 11–13). She testified that another indicator is when the purchaser is accompanied by someone else at the time of the purchase. *Id.* at 13. And more specifically, she explained that the behavior of the purchaser and the other person can reveal clues about the nature of the transaction, including whether the purchaser is communicating with someone that is not filling out the form 4473 and how the person finances the purchase. *Id.* As detailed above, the agents knew that Dulaney was with Moore during the purchases on August 14 and 15, and that his debit card was used to pay for part of the purchase price. *Id.* at 112–13. They also knew that in the course of conducting surveillance and reviewing the gun-store videos, Moore and Dulaney were observed using cell phones at Grove Pawn during the firearms transactions. *Id.* at 46–47, 126. And then they received a tip that Dulaney and Moore purchased guns together at the pawn shop on August 20, *id.* at 129–30, and observed Dulaney place those guns in the back seat of the vehicle he was driving, *id.* at 115–16, 132 All told, the agents had

ample probable cause to believe that Moore and Dulaney were engaged in firearms trafficking.

Moreover, they had probable cause to believe that evidence of that firearms trafficking would be located on the phones they found in the vehicle Dulaney was driving. Agent Gray testified that in the course of conducting surveillance and reviewing the gun-store videos, Moore and Dulaney were observed using cell phones at Grove Pawn during the firearms transactions. *Id.* at 46–47, 126. And Agent Norris explained that someone using a cell phone during a firearms purchase can be another indicator of firearms trafficking. *Id.* at 53. She testified that, in her training and experience, someone purchasing a gun for someone else will often use a phone during the transaction to "take orders" from the actual recipient of the gun. *Id.* Furthermore, Agent Gray testified that Moore had listed a cell phone number on the ATF 4473 forms that she completed when purchasing firearms. *Id.* at 125–26. The form requires a phone number so that the firearms dealer can call the applicant after completing the background check. *Id.* at 126. And finally, one of the seized phones was in plain view in the vehicle and it was set to navigation mode, which could have given the agents evidence about where Dulaney and Moore were headed — and where the soon-to-be recipient of the recently purchased firearms might be located. *Id.* at 84–85. All told, there was

16

probable cause to believe that Moore and Dulaney were engaged in firearms trafficking, and there was probable cause to believe that evidence of that crime would be found on the phones. The cell phones were lawfully seized under the plain view doctrine, and Defendant's motion to suppress evidence seized from the phones, (Doc. 36), should be **DENIED**.[7]

## C.    Motion to Suppress Statements

As detailed above, GSP troopers stopped the vehicle Dulaney was driving on August 20, 2020. A trooper approached the driver's side door and asked Dulaney for his driver's license. Gov't Ex. 1 at 21:03:49. Among some common pleasantries, the trooper asked Mr. Dulaney for his driver's license, asked him how to pronounce his last name, told him that he stopped him because he failed to

---

[7] I decline to address the Government's alternative argument that there was probable cause to seize the phones to find evidence of drug trafficking. The agents found only two ounces of marijuana, (Doc. 55 at 30), which is not a quantity indicative of trafficking. They also found a scale (which gets closer to suggesting distribution—but could also simply be used as a way to confirm the quantity of a user-initiated purchase) and a grinder. All told, the Government's argument on this point is weak. Given the strong probable cause as to firearms trafficking, I decline to further consider the narcotics argument.

Further, the Government argues that the eight days between the seizure of the phones and when it obtained the search warrant was not an unreasonable delay. (Doc. 55 at 30–34). Defendant does not argue that the delay was unreasonable—he simply contends that there was no basis to seize the phones. (Docs. 48, 57). As such, I decline to address this argument.

maintain his lane, asked him if he was tired, asked him how long he had been driving, asked him if he had taken any medications, and asked him if he had anything to drink. *Id.* at 21:03:45–21:05:45. The trooper asked if anyone had a weapon, and it is not clear whether Dulaney answered. *Id.* at 21:04:45–21:04:50. However, Moore clearly said that there was an unloaded weapon in the vehicle, the trooper asked Dulaney whether he had a weapon, and he said no. *Id.* at 21:04:50–21:04:59. The troopers asked Dulaney to step out of the car, and they placed him in handcuffs. *Id.* at 21:05:45.

One of them asked him again if he carried any weapons, to which Dulaney said, "no sir." *Id.* at 21:06:00. The trooper asked him about the gun that Moore had identified, and they had a back-and-forth conversation about the firearm. *Id.* at 21:07:39–21:08:07. A trooper advised Dulaney of some of his *Miranda* rights— including that he had the right to remain silent, the right to an attorney, that anything he said or did would be used against him in court, that he could have an attorney present during questioning, and that he could stop answering questions at any time. *Id.* at 21:08:10–21:08:30. Dulaney said he understood his rights and talked to the trooper. *Id.* at 21:08:29.

Some time later, but still while at the scene, Special Agent Norris spoke with Dulaney. (Gov't Ex. 10). She asked him his date of birth and address. *Id.* at 00:12–

18

01:00. She advised Dulaney of his *Miranda* rights, and he signed a written waiver of those rights. *Id.* at 01:00–02:35; Gov't Ex. 11.

Defendant filed a post-hearing brief arguing that his statements should be suppressed because the *Miranda* warnings Defendant received from the GSP trooper were incomplete—the trooper never told him that if he could not afford a lawyer, one would be appointed for him at no cost. (Doc. 49). Defendant did not identify any deficiencies in the warnings that he received from Agent Norris. The Government, in its response brief, argued that Dulaney waived his *Miranda* rights and that his statements were knowing and voluntary. (Doc. 55 at 24–27). The Government did not address, however, the one argument that Defendant actually made—that the warnings from the trooper were inadequate.

On June 7, 2024, I issued an order directing the Government to state whether it intends to use, in its case in chief, any of the statements Defendant made to the GSP trooper. (Doc. 59). And I directed the Defendant to clarify whether he challenges any of the statements that he made to Agent Norris. *Id.* Both parties responded to the order. The Government makes clear that of the statements Dulaney made to the trooper, it intends to use only those that he made prior to when he was removed from the vehicle and handcuffed. (Doc. 61). And Dulaney clarified that he does not challenge or seek to suppress any of the statements that

19

he made to Agent Norris. (Doc. 60).

That leaves only those statements that Dulaney made to the trooper before he exited the vehicle—about how to pronounce his last name, whether he was tired, how long he had been driving, if he had taken any medications, if he had anything to drink, and whether he had a weapon. As to these statements, the Government argues that Defendant was not in custody at the time he was in his car, prior to when he was removed and handcuffed. (Doc. 61).

The Fifth Amendment requires courts to "exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel." *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010). The entitlement to *Miranda* warnings, however, "attaches only when custodial interrogation begins." *Id.* (internal quotation marks omitted). "Normally courts apply a two-part test to determine whether a suspect is in custody for *Miranda* purposes: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004) (internal quotation marks omitted). And the Supreme Court has held that "persons temporarily

detained pursuant to [ordinary traffic] stops are not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).

Here, there is nothing that occurred during the less than two minutes that Dulaney was in the car and speaking with the trooper, prior to when he was asked to step out and was handcuffed, to take this case outside the holding of *Berkemer*. Nor does Defendant make any argument, in any of his briefs, about the statements that he made to the trooper other than as it relates to those which came after the trooper's *Miranda* warnings. As such, the statements Dulaney made to the trooper while Dulaney was in the car should not be suppressed. The Government has stated it will not use the statements Defendant made to the trooper after Dulaney was handcuffed, and Dulaney does not challenge the statements that he made to Agent Norris. Nor does Dulaney argue that any of this statements were involuntary. In sum, Dulaney's motion to suppress should be **DENIED** in part (as to the statements he made while still in the car prior to being handcuffed) and **DENIED AS MOOT** in part (as to the post-handcuff statements he made to the trooper and as to the statements he made to Agent Norris).

## III.   CONCLUSION

For the reasons explained above, I **RECOMMEND** that the motions to suppress evidence seized as a result of the traffic stop, (Docs. 35, 40), be **DENIED**; that the motion to suppress evidence seized from the three phones, (Doc. 36), be

**DENIED**; and that the motion to suppress statements, (Doc. 34), be **DENIED** in part (as to the statements Dulaney made while still in the car prior to being handcuffed) and **DENIED AS MOOT** in part (as to the post-handcuff statements he made to the trooper and as to the statements he made to Agent Norris).

This case is not yet certified ready for trial. Defendant Moore has a pending motion to suppress statements, (Doc. 38), which I will address in a separate Report and Recommendation.

**IT IS SO RECOMMENDED,** this 11th day of July, 2024.

_____
CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE